

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

2009 SEP 22 ⊓ 2: 28

Sarah Midgett,              )     C. A. No. 2:08-2162-MBS-RSC
                            )
            Plaintiff,      )
                            )
       -versus-            )     **REPORT AND RECOMMENDATION**
                            )
Charleston County Sheriff's )
Office and J. Al Cannon, Jr., )
as Sheriff of Charleston    )
County,                     )
                            )
            Defendants.     )

   This employment discrimination case is before the

undersigned United States Magistrate Judge for a report and

recommendation on the defendants' motion for summary judgment

filed on July 10, 2009. 28 U.S.C. § 636(b).

   The plaintiff, Sarah Midgett, sued her current employer, the

Charleston County Sheriff's Office[1], and J. Al Cannon, the

Sheriff of Charleston County, on June 10, 2008. She brought

causes of action for discrimination based on sex in violation of

Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et*

*seq.*, and retaliation for protected activity in violation of

Title VII, as well as violations of 42 U.S.C. § 1981.[2]

---

   [1] The "Charleston County Sheriff's Office" is not <u>sui
juris</u>, not capable of suing or being sued in its own right. As a
result, the "Charleston County Sheriff's Office" should be
dismissed as a named defendant.

   [2] At oral argument, Plaintiff's attorney conceded the § 1981
cause of action and the cause of action should be dismissed on
that basis.

1

The plaintiff filed an opposition to the summary judgment motion on August 10, 2009. The defendants filed a reply on September 3, 2009, and the plaintiff filed a surreply on September 8, 2009. Oral arguments on the motion were had before the undersigned on September 9, 2009. Hence it appears consideration of the motion is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of

2

fact to find for the non-moving party, disposition by summary judgment is appropriate." <u>Teamsters Joint Council No. 83 v. CenTra, Inc.</u>, 947 F.2d 115, 119 (4th Cir. 1991); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. <u>Ash v. United Parcel Service, Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 242 (4th Cir. 1982).

## **APPLICABLE EMPLOYMENT DISCRIMINATION LAW**

Midgett alleged that she was harassed by her supervisor Deputy Robert Smith on account of her female sex which subjected her to a hostile work environment in violation of Title VII. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1).

In prohibiting discrimination in the "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), Title VII

3

does not merely proscribe discriminatory acts that result in "tangible loss of an economic character," <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted). Rather, Title VII is also violated when an employee suffers sexual harassment that is "sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." Id. at 67, 106 S.Ct. 2399 (internal quotation marks omitted). In order to prevail on a claim for sexual harassment amounting to a hostile work environment, a plaintiff must prove "(1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." <u>Gilliam v. South Carolina Department of Juvenile Justice</u>, 474 F.3d 134, 142 (4th Cir. 2007); <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (<i>en banc</i>); <u>Conner v. Schrader-Bridgeport Int'l, Inc.</u>, 227 F.3d 179, 192 (4th Cir. 2000).

In <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find

hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367 (1993)).

In assessing whether a work environment is objectively hostile, a court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris at 23, 114 S.Ct. 367. No single factor is determinative. See, id. In assessing whether the environment was objectively hostile, a court must bear in mind that Title VII is "designed to protect working women from the kind of male attentions that can make the workplace hellish for women.... It is not designed to purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995); see, Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997) (noting that "Title VII is not a federal guarantee of refinement and sophistication in the workplace"). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). "[C]omplaints premised on nothing more than rude treatment by co-workers, callous behavior by supervisors, or a

5

routine difference of opinion and personality conflict with one's supervisors are not actionable under Title VII." Id.

### Employer's vicarious liability for discrimination

Midgett claims that Smith was her supervisor and, as such, is liable for discrimination by Smith. Not surprisingly, the defendants contend that Smith was a mere co-worker of Midgett's for purposes of her Title VII claim.

The Fourth Circuit has previously observed that "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee." Nye v. Roberts, 145 Fed. Appx. 1 (4th Cir. 2005) citing Mikels v. City of Durham, 183 F.3d 323, 331 (4th Cir. 1999) (internal quotes omitted). The Nye court wrote:

> Of key importance in determining whether the illegal acts of an employee should be imputed to the employer is whether the misconduct was "aided by the agency relation." Id. at 331-32. In Mikels, we explained that:
>
>> Two bright line rules define the boundaries of the root principle. Any harassing conduct that culminates in a "tangible employment action" against the victim is necessarily conduct "aided by the agency relation," since it can only be taken by supervisory employees empowered by their employers to take such action. In that circumstance, vicarious liability is absolute, without regard to whether the employer knew, or should have known, or approved of the act, or sought to prevent or stop it. At the other end ..., harassment by a fellow-employee having no authority of any kind over the victim never can

6

be found "aided by the agency relation"; as to
such employees, the agency relation provides no
"aid" for their conduct but workplace
proximity, and that does not suffice for the
purpose. Id. at 332 (citations omitted)
(footnote supplied). Ultimately, "[t]he
determinant is whether as a practical matter
[the] employment relationship to the victim was
such as to constitute a continuing threat to
her employment conditions that made her
vulnerable to and defenseless against the
particular conduct in ways that comparable
conduct by a mere co-worker would not." Id. at
333.
Without a basis to impute liability to the
employer, the Board is potentially liable only
for any negligence in taking action to stop the
alleged harassment. Id. at 332.

## Exhaustion of Administrative Remedies

Midgett also alleged that following her report of the
harassment to Sgt. Anderson, Lt. Karges, and Inspector Whited
with Internal Affairs she was retaliated against for her
protected activity. The defendants assert that this claim is not
cognizable here because the plaintiff failed to exhaust her
administrative remedies before the EEOC, as required.

Before a federal court may assume jurisdiction over a claim
under Title VII, "a claimant must exhaust the administrative
procedures enumerated in 42 U.S.C. § 2000e-5(b), which include an
investigation of the complaint and a determination by the EEOC as
to whether 'reasonable' cause exists to believe that the charge
of discrimination is true." Davis v. North Carolina Dep't of
Correction, 48 F.3d 134, 137 (4th Cir. 1995). The exhaustion
requirement ensures that the employer is put on notice of the

alleged violations so that the matter can be resolved out of court if possible. See, EEOC v. American Nat'l Bank, 652 F.2d 1176, 1186 (4th Cir. 1981).

Generally speaking, this court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge. Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995). However, an employee's claims in federal court are not strictly limited by the allegations of the EEOC charge, but rather by the scope of the EEOC investigation which can reasonably be expected to result from the charge of discrimination. Miles v. Dill, 429 F.3d 480 (4th Cir. 2005); King v. Seaboard Coast Line R.R. Co., 538 F.2d 581, 583 (4th Cir. 1976); EEOC v. General Elec. Co., 532 F.2d 359, 362 (4th Cir. 1976). In other words, a claim omitted from the administrative charge can be maintained in a Title VII complaint only where the claim is "reasonably related to the allegations and claims in the administrative charge or, if disclosed, the omitted claim could reasonably be expected to follow from the administrative investigation based on the deficient administrative charge." Nicol v. Imagematrix, Inc., 767 F.Supp. 744, 753 (E.D.Va. 1991).

## FACTS

The facts, either undisputed or as presented by the plaintiff, with all reasonable inferences drawn in favor of the plaintiff as the non-moving party for purposes of summary

judgment, to the extent supported by the record, are as follow.

Plaintiff Midgett has been employed as a Deputy in the Sheriff's Office since October 2004. The first two and a half years of her employment as a Deputy were relatively uneventful; Midgett did not have any significant conduct or discipline problems, and she received at least "Meets Expectations" on her performance evaluations. Most of Midgett's supervisors viewed her as a good employee who worked hard to perform her duties.

In February of 2007, Midgett applied for and received a promotion to the rank of Deputy First Class, based on the recommendation of the various officers in her chain of command. Midgett's promotion recommendation was initiated by her direct supervisor, Sergeant Naomi Morris, and was recommended up the chain of command by Lt. George Karges, Captain Michael Stanley, and Major Thomas Honan.

In April 2007, Midgett applied for and received a lateral transfer from her patrol position on B-Patrol North to an open position as a Narcotics Investigator in the unit known as Metro. Metro is a specialized unit that encompasses the department's K-9 and Narcotics/Vice Units. The work in Metro can be stressful, grueling and dangerous. When an officer, such as Midgett, is transferred to Metro, the officer is assigned to a more experienced officer who acts as a Field Training Instructor

("FTI"). The FTI is not a true supervisor in the sense that the
officer cannot discipline, complete formal performance
evaluations, or do other things that a true supervisor has the
authority to do. Further, the trainee and the FTI are of equal
rank.

However, the FTI is a supervisor in the sense in that the
FTI is tasked with showing the trainee how to perform the work.
He has significant control of the trainee's work and determines
if and when a trainee is prepared to work without a FTI. In a
letter of reprimand from Major T. Honan to Deputy Smith, Honan
wrote, "As an FTI, you have been granted authority and control
over the Sheriff's Office employees entrusted to you during their
training. This is, in every important respect, a supervisory
position." (Deft's Ex. E). Midgett's FTI was Deputy Robert
Smith. He is also the husband of the Assistant Sheriff Andrene
Coury-Smith, who runs the day to day operation of the Sheriff's
Office and is directly under Sheriff Cannon in the chain of
command. Midgett's formal line of supervision in Metro included
Sgt. Mike Anderson, Lt. Michael Conkey and Capt. Michael Benton.

Midgett began her tenure in Metro on April 13th or 14th and
took "a couple of" weeks off to be with her visiting mother. (Pl.
dep. pgs. 80-81). She then began working with Smith at the end
of April. Smith made no comments to Midgett for their first two
weeks together. (Pl. dep. pg. 88). Then Smith started making

10

comments[3] and Midgett told him at once that she did not like the comments and that she wanted him to stop. Smith did not stop and made comments to her and made them "several times a week." (Pl. dep. pg. 91).

Midgett did not tell Smith to stop making the comments again after the first time she told him. Midgett did not tell anyone about the comments at the earliest for another two weeks because she "hoped it would stop eventually." (Pl. dep. pgs. 93, 94, 97). She took time off again from May 17th to May 21st.

On May 21st she was called into the conference room to a meeting with her supervisor Anderson and Smith where she was told that "[she] didn't appear to be dedicated to the unit." (Pl. dep. pg. 98). Midgett responded that "it was hard to be motivated and appear to be happy when Rob was saying those comments to me all the time and treating me the way he was." (Pl. dep. pgs. 98, 99). After Smith left the room, Midgett told Anderson that Smith called her "happy tits" and told her to "get the sand out of your pussy," and that once she asked Smith a question and in response he made a choking gesture toward her. Further Midgett said that once he demonstrated his anger with her because she was late by hanging up the telephone on her and refusing to train her. (Pl.

---

[3] The comments Midgett alleges Smith began making to her during the second week of May 2007 and thereafter were the following: "happy tits", "beer tits", "are you on the rag", "pull the tampon out", and, "wipe (or get) the sand out of your pussy."

dep. pgs. 99-102). Anderson told Midgett "to keep [her] head up" and that it was just Smith's personality and to get her training finished. (Pl. dep. pg. 101). Neither Anderson nor Midgett followed the Office's procedure for reporting sexual harassment in that neither put the complaint in writing. However, Midgett believes that Anderson told her that he would speak to Smith about it.

Thereafter, Smith stopped making the sexual comments for a few days to about a week and then started making the comments to her again. (Pl. dep. pgs. 126, 127). Midgett did not tell Anderson that the comments had resumed or report the comments to Conkey or Benton. Midgett does not know whether Anderson, Conkey, or Benton ever observed Smith making comments to her. (Pl. dep. pgs. 107-112). Midgett deposed that Smith did not make such comments to other members of the Metro unit. (Pl. dep. pgs. 89-90).

Also, after May 21, 2007, Smith told Midgett to perform push-ups in front of him and other male deputies in Metro on two occasions in the Metro squad room. On the first occasion, someone in Metro whom she could not recall asked her if she "can do push-ups." In response, Smith said to Midgett, "come on, give me one push-up." Midgett did one pushup and those present, including Smith, laughed. The second time Midgett performed push-ups was when Smith, along with others in Metro, asked

Midgett if she could do any pushups. Smith asked her if she had been working-out. Midgett told Smith she could do push-ups and Smith, in response, said "[l]et's see how many you can do." Midgett subsequently performed the push-ups in front of others present. Nothing more was said to her about it. Midgett did not report either of the push-up incidents.

Next, beginning a week or two after the May 21st complaint to Anderson, or put another way, no later than June 4, 2007, Midgett began training directly with Anderson and worked with Anderson as her direct training instructor until June 18, 2007. (Pl. dep. pg 129, 134). During this time, Smith was not actively involved in Midgett's training. While training with Anderson, Midgett has no recollection of complaining to Anderson about Smith's past comments to her or about the two occasions she was required to do push-ups in front of others assigned to Metro.

On Monday, June 18, 2007, Midgett began training with the Metro Vice Unit and continued training with the Metro Vice Unit until her transfer from Metro back to patrol on or about June 28, 2007. Although both the Narcotics and Vice Units are part of Metro, Vice operated independently of Narcotics. During her Vice training, Smith was not training her or frequently working with Midgett.

On June 27, 2007, Midgett ran into Sgt. Naomi Morris, Midgett's former supervisor in Midgett's prior patrol unit.

13

Morris asked Midgett how things were going in Metro. In
response, Midgett told Morris that she was not happy in Metro and
asked if it were possible for her to return to her former
position on patrol. Morris assured Midgett they would like to
have her back, but Morris wanted to know what the problems were
that made Midgett want to transfer. Midgett told her she could
not talk at the moment but would return when she could talk.
Later that same day, Midgett went back to Morris and told her
that the reason for wanting out of Metro was that she was getting
bad treatment from her FTI, Smith. According to Morris, Midgett
said that Smith questioned her physical ability to do the job and
made her do push-ups in front of her coworkers. Midgett said
that Smith yelled at her and belittled her. Midgett also said
that Smith acted inappropriately with other male officers as
well, and that Smith had engaged in physical altercations with
male co-workers and trainees. Midgett told Morris that Smith
used profanity and vulgar language when speaking to her, a
particular concern to Morris because many of the vulgarities were
of a sexual nature.

Morris suggested that this could constitute sexual
harassment and told Midgett that she should report it.
According to Morris, Midgett did not want to file a report.
However, Morris convinced Midgett to talk to Lieutenant George
Karges. Although Karges was not in Metro, he had previously been

14

in Midgett's chain of command in her former patrol unit. Midgett agreed to speak with Karges and phoned him that day. She told him essentially the same things she told Morris. Midgett told Karges that she had never reported Smith's actions and comments to either Anderson, Conkey or Benton, her direct chain of command, because she had seen Smith curse at these supervisors without repercussions, she believed that nothing would be done to stop Smith, and she was afraid that Smith's behavior would only worsen. (Karges dep. pg. 121-126). Karges encouraged Midgett to report her allegations to the department, including her Metro chain of command.

Karges went the following day, June 28, 2007, and reported the allegations directly to Inspector Kevin Whited in the Internal Affairs Unit. As required by Sheriff's Office policy, Whited initiated a formal investigation into Midgett's allegations. As part of his investigation, Whited interviewed Anderson, Conkey, Morris, Karges, Midgett, and Smith, as well as the other employees who worked with Midgett and Smith in Metro. Finally, he interviewed each individual who either witnessed or was allegedly involved in physical and verbal altercations with Smith.

Each witness remembered different details or couched them in a somewhat different light according to his or her own perspective, but, overall the story was basically the same.

According to virtually every witness, Smith used profanity, and comments of a sexual nature including the comments Midgett claims Smith made directly to her. Several witnesses reported that vulgarities and profanity were used by many employees in Metro. The other witnesses reported that the sexual vulgarities were directed at other Metro officers as well. (Pl. dep. pg 184-185).

Midgett told Whited, during both of her interviews, that, she did not view Smith's sexual comments to her as "sexual harassment" in the sense that "he wanted to sleep with me, but that it was-they were sexual comments directed at me specifically, and it made the environment very uncomfortable to work back there." (Pl. dep. pg. 182-184, 236). Whited asked Midgett, "So let me ask you this question. If everything were golden, if-if you were back there running and gunning and there was a beautiful relationship between you and Rob, everything-I mean, you love Rob Smith, would these statements have affected you?", and Midgett answered, "no." (Pl. dep. pg. 185-186). And she did not wish to bring a complaint. (Pl. dep. pg. 148). At the second interview with Midgett, Whited and Inspector Herron were present. (Pl. dep. pg. 151).

The evening of the day Whited of Internal Affairs interviewed Midgett, June 28, 2007, Anderson and Conkey wanted to speak with Midgett and Midgett wanted to speak with them as well. Midgett told them that she wanted to transfer back to her old

patrol unit. (Pl. dep. pg. 165). Thereafter, she was transferred
and had no more contact with Smith except when she was cleaning
out her desk in Metro and he was present, but said nothing to
her. (Pl. dep. 193).

Upon the conclusion of the investigation, Whited prepared a
report summarizing the interviews and his conclusions. Whited
concluded that Smith's conduct and use of vulgar language
violated the Office's conduct standards for officers.

Normally, an internal investigation report would have gone
to Assistant Sheriff Coury-Smith for a determination of
appropriate discipline or other action. Since Rob Smith is
married to Coury-Smith, she removed herself from involvement in
the investigation. As a result, Smith's final discipline was
determined by Honan. Honan discussed with Smith the
inappropriate nature of his conduct and the need for marked and
immediate improvement. In addition, Honan issued a formal letter
of reprimand to be included in Smith's personnel file. In part,
the letter read:

> [T]he investigation by the Office of Professional
> Standards concluded that your behavior and
> language in your interactions with Metro trainees
> was wholly inappropriate. I agree with their
> assessment. ...Your language and conduct created
> unnecessary conflict, and projected a negative
> impression of the Metro unit, and its chain of
> command. It also impaired the efficiency of your
> unit, and complicated your chain's ability to
> appropriately address trainee shortcomings." (Def.
> ex. E).

17

Honan suspended Smith's eligibility to serve as a Training
Officer for six months subject to review at the end of the six
month period to determine whether the suspension should be lifted
or extended.

Midgett had transferred into Metro at her own request and
her transfer out in June 2007 was also made at her own request.
Midgett claims that she made the latter request because of Smith,
but also claims that the defendant retaliated against her for her
complaint to Anderson by transferring her out of Metro which
effectively stopped her training in Metro. (Pl. dep. pgs. 206-
208). Midgett deposed that Smith's comments after the report to
Anderson on May 21, 2007, were a continuation of his harassment
of her and not done in retaliation for her protected activity.
(Pl. dep. pg. 209-210). Further, Midgett denied that there had
been physical harassment, sexual gestures, or sexual advances
toward her. (Pl. dep. pg. 210-212, 223).

On October 4, 2007, Midgett filed a charge of discrimination
with the EEOC. On her charge form, she checked the box for sex
discrimination, but not the box for retaliation. In her
narrative explaining her charge, Midgett stated that:

> I. I was hired in October 2004 as a Deputy Sheriff
> by the above named employer. In May 2007, I
> applied for and was afforded the Narcotics
> Investigator position. From May 2007 through June
> 30, 2007, I was subjected to a hostile work
> environment by being harassed, sexually harassed,
> and having to endure physical hazing by my
> immediate supervisor, Detective Rob Smith,

18

Training Officer. Detective Smith would address me
with derogatory sexual comments in the presence of
my male co-workers. I complained to Lieutenant
G.W. Karges. Due to the great stress created by
the hostile environment I was subjected to, I
requested and received a transfer from my METRO
assignment back to B-Patrol North.

II. Detective Smith gave me no reason for
subjecting me to the hostile environment.

III. I believe that I have been discriminated
because of my sex, female, in violation of Title
VII of the Civil Rights
(Def. ex. J).

Following an investigation the EEOC found no cause to believe
that Midgett had been discriminated against because of her sex.
The EEOC finding made no mention of any claim of retaliation or
investigation thereof.

Since Midgett's transfer back to a patrol unit in June 2007,
she applied for and was selected for a position as a School
Resource Officer. Midgett's transfer out of Metro and back to a
patrol position did not affect her wages, benefits or rank; it
was a lateral transfer. Midgett claims the transfer from Metro
deprived her of overtime pay but she also said that now she gets
"comp time" instead. (Pl. dep. pg. 245).

While Midgett was assigned to Metro, her husband, Adam
Midgett, applied for a position as a Deputy Sheriff. He was
subsequently hired by the defendant and continues to work as a
deputy. Similarly, Plaintiff's father-in-law was hired later by
the defendant.

## DISCUSSION

A review of the record and relevant case law indicates that the defendants' motion for summary judgment should be granted on all grounds except the plaintiff's claim of sex discrimination in the form of a hostile working environment in violation of Title VII.

### Sexual Harassment Claim

The evidence taken in the light most favorable to the plaintiff and with all reasonable inferences drawn in favor of the plaintiff as the non-moving party is unquestionably sufficient to submit Midgett's hostile environment claim to the jury. Midgett was the sole female deputy working in the Metro unit and when she worked with Smith, Midgett was subjected, on an almost daily basis, to verbal assaults of the most vulgar and humiliating sort and was made to perform physical exercises in front of her male supervisor and her male co-workers. Such evidence suffices to create a jury question regarding whether the harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of employment. See, EEOC v. R & R Ventures, 244 F.3d 334, 340 (4th Cir. 2001) (concluding that environment was hostile when employee was subjected to comments about her breasts and buttocks and inappropriate sexual remarks on a daily basis); Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999) (concluding that district court erred in granting

summary judgment for employer on hostile environment claim when plaintiff produced evidence of "a host of indignities" including "verbal abuse interlaced with sexual and racial epithets," "[r]ude sexual gestures," and "sexual insults ... written on the walls of the company restroom").

Further, there is evidence from which a reasonable jury could conclude that the complained of conduct was unwelcomed and that Midgett subjectively found it to be severe and pervasive in that Midgett asked Smith to stop the conduct, and reported it to Smith's supervisor Anderson, as well as to Morris, Karges, and Whited. Midgett also told Anderson and Smith on May 21st that she could not perform her work up to her abilities because of Smith's conduct toward her, demonstrating that Smith's behavior was such that it created an abusive working environment and altered her conditions of employment.

Additionally, whether Smith was Midgett's supervisor for purposes of imputing liability to the defendant is a question for the factfinder. Here, it was Smith's job to show Midgett, as a trainee, how to perform the work, he had significant control of Midgett's work, and he was to determine if and when Midgett was prepared to work without a FTI. These facts could support a finding that Smith was Meggett's supervisor when the alleged harassment occurred and is consistent with Major Honan's letter of reprimand to Smith in which Honan wrote "you have been granted

authority and control over the Sheriff's Office employees entrusted to you during their training. This is, in every important respect, a supervisory position."

Finally, if Smith was not Midgett's supervisor, a reasonable factfinder could still impose liability on the defendant because there is evidence which would support a conclusion "that the Defendant was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment." Keeshan v. Eau Claire Co-op. Health Centers, Inc., 2007 WL 2903962 (D.S.C. 2007) (J. Seymour) citing Alexander v. Alcatel NA Cable Systems, Inc., 50 Fed.App x. 594, 601 (4th Cir. Oct. 15, 2002); Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999). Midgett presented evidence that she complained about Smith's sexual harassment to Smith's supervisor Anderson on May 21, 2007), but that that report did not result in prompt remedial action. If believed, Midgett's version of events could support liability under Faragher v. City of Boca Raton, 524 U.S. 775, 778, 118 S. CT. 2275 (1998). Summary judgment should be denied.

## Retaliation Claim

The defendant seeks judgment as a matter of law on the retaliation cause of action and argues that Midgett failed to exhaust her administrative remedies before the EEOC, thus depriving this court of jurisdiction over her claim. It appears that the defendant is correct.

The question here is whether Midgett's claim that she was retaliated against for complaining about discriminatory treatment is reasonably related to her EEOC charge of sexual harassment such that it would have reasonably been expected to follow from an administrative investigation of that charge. In the Charge, Midgett noted in the section labeled "DISCRIMINATION BASED ON" that her discrimination claim was based upon "SEX." Although a separate box appears for "RETALIATION" AND "OTHER" in the same section, Midgett did not mark them. Midgett's responses in this section of the Charge solely indicate that her discrimination claim was based upon gender only. Additionally, a reading of Midgett's narrative statement in "THE PARTICULARS" section of the Charge reveals no allegation of retaliation for reporting the discrimination.

In short, Midgett's charge does not remotely allege that she suffered retaliation because she had complained of Smith's discriminatory conduct to his supervisor, and it does not otherwise allege facts that would have put the defendant or the EEOC on notice that she was charging the defendant with retaliation. Thus it appears that Midgett's retaliation claim is not reasonably related to her charge such that it would have been expected to follow from an investigation of Midgett's sex discrimination claim. Bryant v. Bell Atlantic, 288 F.3d 124 at 133 (4th Cir. 2002) ("Administrative investigation of retaliation

... could not reasonably be expected to occur in light of Bryant's sole charge of race discrimination, and the investigation of the complaint did not touch on any matters other than race discrimination."). Like Bryant, the EEOC investigation of the plaintiff's complaint did not touch on any matter other than discrimination.

Therefore, because the scope of Midgett's complaint exceeds the limits set by the allegations of her administrative complaint, the court may not consider the merits of Midgett's retaliation claim.

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment on all causes of action be granted except the plaintiff's cause of action for sexual harassment in violation of Title VII. Further, the Charleston County Sheriff's Office should be stricken from the caption hereof as not sui juris.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina
September **22** , 2009

24